WINKELMANN, RESPONDENT, *v.* MINNESOTA MUTUAL
LIFE INSURANCE CO. ET AL., DEFENDANTS; SAVAGE
HARDWARE CO., APPELLANT.

(No. 5,083.)

(Submitted March 3, 1923. Decided March 19, 1923.)

[213 Pac. 1104.]

*Contracts—Life Insurance Policies—Equitable Assignment—-
Surety — Performance — Release from Liability — Right to
Change Beneficiary.*

Contracts—Construction—Intent of Parties to be Ascertained.
　1.　In the construction of a contract the courts must, if possible,
ascertain and give effect to the mutual intention of the parties at the
time they entered into it so far as that may be done without con-
travening legal principles, greater regard being had to their clear
intent than to any particular words used in the expression of that
intent.

Same—Life Insurance Policy—Equitable Assignment as Security ˙for
Faithful Performance of Duty—Construction of Agreement.
　2.　The president of a corporation assigned a life insurance policy
to the corporation as indemnity for any loss ˙or liability it might
sustain from anything he might do during the time of his incum-
bency, the corporation agreeing to pay the premiums and it being
substituted in the policy for the then beneficiary, with the right re-
served in the insured to make further changes in that regard.  Upon
severing his connection with the corporation which issued to him a
complete acquittance, he took possession of the policy and had the
name of the beneficiary changed from the corporation. to his wife.
On his death the wife demanded payment, as did also the corpora-
tion, it claiming that the designation of itself as beneficiary was
irrevocable.  *Held,* under the above rule and in the light of the
circumstances under which the contract between the parties was made,
that the transaction amounted to an equitable assignment of the
proceeds of the policy as security for the faithful performance by the
insured of the duties owing by him to the corporation, and that upon
his quitting its service and securing an acquittance from it, his lia-
bility under the contract was satisfied by its performance, leaving
him at liberty to change the beneficiary as he saw fit.

*Appeal from District Court, Lewis and Clark County; W. H.
Poorman, Judge.*

ACTION by Lydia C. Winkelmann against the Minnesota Mu-
tual Life Insurance Company, in which action the . Savage
Hardware Company was substituted as defendant.  Judgment

for plaintiff, and defendant Hardware Company appeals. Judgment affirmed.

*Messrs. Hurley & O'Neill* and *Messrs. Walsh, Nolan & Scallon,* for Appellant, submitted a brief; *Mr. C. C. Hurley* argued the cause orally.

The Savage Hardware Company will concede that a person taking out a policy of insurance has a right to reserve the right to change beneficiary at will; that no person acquires an interest in the proceeds of a policy of insurance by merely being named as the beneficiary thereof and acquires no interest by merely paying the dues or assessments thereon. But on the other hand it contends that the right to change beneficiaries is a valuable right which the insured may dispose of by contract and thus deprive himself of the right to change beneficiaries. The policy of insurance involved in this case had no cash or other surrender value, and default in the payment of the premiums avoids the contract, and had no value during the life of the assured except the value of the right to keep the policy in force. (*Knights of Maccabees* v. *Sharp,* 163 Mich. 449, 33 L. R. A. (n. s.) 780, 128 N. W. 786.) In the case of *Brett* v. *Warnick,* 44 Or. 511, 102 Am. St. Rep. 639, 75 Pac. 1061, the court said: "Where a person becomes a member of a Mutual Benefit Association, under an agreement with the beneficiary named in the certificate that he, the beneficiary, shall pay all the assessments, and they are so paid accordingly, the beneficiary thus acquires a vested interest in the certificate, so that the member cannot afterward make another designation without the consent of the beneficiary." (See, also, *McGrew* v. *McGrew,* 190 Ill. 604, 60 N. E. 861; *Benard* v. *Grand Lodge A. O. U. W.,* 13 S. D. 132, 82 N. W. 404; *Stronge* v. *Supreme Lodge K. of P.,* 189 N. Y. 364, 12 L. R. A. (n. s.) 1207, 82 N. E. 433.)

In 3 Am. & Eng. Ency. of Law, 2d ed., 993, the rule is given as follows: "Where the member, upon taking out the certificate makes an agreement with the beneficiary that the

latter should pay the assessments and that no substitution should be made, the beneficiary, upon performing this agreement, acquires a vested right.'' (14 R. C. L., sec. 1389; 29 Cyc. 128.)

The Minnesota Mutual Life Insurance Company was the only one involved in this case that had the right to complain if the terms of the policy of insurance had not been fully complied with, and any rights it had in that respect, it waived when it acknowledged liability and paid the funds into court. (*Hoeft* v. *Supreme Lodge,* 113 Cal. 91, 45 Pac. 185; In *Knights of Maccabees* v. *Sackett,* 34 Mont. 357, 115 Am. St. Rep. 532, 86 Pac. 423.)

This action as it now stands, is a contest between two parties who claim the proceeds of this policy of insurance as beneficiaries, neither of whom acquired any vested interest in the same merely by being named as beneficiary (14 R. C. L., sec. 1376). This is an equity case and the funds involved in this action should be awarded to the one showing the better right to the same. (14 R. C. L., sec. 554.)

*Messrs. Day & Mapes,* for Respondent, submitted a brief; *Mr. E. C. Day* argued the cause orally.

It is apparent from this analysis of the evidence that the finding of the court below, that the appellant had failed to establish the contract alleged, or any contract which under the authorities cited would give rise to any equities, was not error, and should be affirmed. While there are courts which take the position that the holder of a mutual benefit certificate of insurance, as to which by the by-laws of the society the right to change the beneficiary is reserved, may barter away that right by an oral agreement with a third party, based upon a sufficient consideration, followed by performance, and that the mutual benefit society may waive compliance with its by-laws, yet even as to such societies the better reasoned authorities are opposed to this doctrine. (*Grand Lodge* v. *Denzer,* 129 Ky. 202, 110 S. W. 882; *Grand Lodge* v. *McFadden,* 213 Mo. 269,

111 S. W. 1172; *Supreme Council* v. *Heitzman*, 140 Mo. App. 105, 120 S. W. 628.) This court has gone on record as holding, even in the case of mutual benefit societies, that the by-laws must be complied with, and that the society cannot waive such compliance by act done *after* the death of insured. (*Knights of Maccabees* v. *Sackett*, 34 Mont. 257, 115 Am. St. Rep. 532, 86 Pac. 423.)

A beneficiary who has been legally designated as such in a life insurance policy has such an interest in the policy as cannot be defeated except by a change of beneficiaries in compliance with the by-laws, and these cannot be waived by the insured by bringing the money into court. (*Neary* v. *Metropolitan Life Ins. Co.*, 92 Conn. 488, L. R. A. 1918F, 306, 103 Atl. 661.)

In a life insurance policy, such as the one in suit, the beneficiary designated in accordance with the by-laws has some interest, which the insured has reserved to himself the power or right to extinguish or cut off, by a compliance with the terms of the power contained in the contract. But he can only extinguish this interest by strict compliance with the terms of the policy. And this compliance the insurer cannot waive. (*Indiana National Life Ins. Co.* v. *McGinnis*, 180 Ind. 9, 45 L. R. A. (n. s.) 192, 101 N. E. 289; *Johnson* v. *New York Life Ins. Co.*, 56 Colo. 178, 138 Pac. 415.)

MR. JUSTICE HOLLOWAY delivered the opinion of the court.

In February, 1915, W. F. Winkelmann, cashier of the Farmers' & Merchants' State Bank of Savage, Montana, secured a policy of insurance for $5,000 upon his life in the Minnesota Mutual Life Insurance Company. The policy was obtained for the purpose of securing the bank against any loss which it might suffer through the acts of Winkelmann, and to that end the bank was named beneficiary in the policy "with the right of revocation," however, reserved to the insured. The bank agreed to pay the annual premiums on the policy and did pay

the first four. Later Winkelmann became vice-president of the bank and continued in that position until June, 1918, when he resigned his office, severed his connection with the bank, and entered the employ of the Savage Hardware Company, a domestic corporation of which he was president and in which he owned or controlled a majority of the stock.

When he severed his connection with the bank, Winkelmann was informed that the bank would no longer carry the policy of insurance, and he then suggested to Jens Miller, a director of the hardware company, that it "would be a good idea" for the hardware company to carry the policy as the bank had done, and to this suggestion Miller agreed, but nothing further was done about the matter at that time or at the annual meeting of the stockholders in January, 1919. About February 14, 1919, Winkelmann, Miller, Anderson, Johnson and Christlaw met in the hardware store and the agreement over which this controversy wages was entered into. On the following day Winkelmann secured the policy from the bank, and Christlaw, the secretary and manager of the hardware company drew that company's check for $40.75 in part payment of the premium then due. The policy, the check and a written request for change of beneficiary were sent to the insurance company, and in due course the policy was returned to Winkelmann, bearing the insurance company's indorsement to the effect that the beneficiary had been changed by substituting the name of the hardware company for the bank "with the right of further change" reserved to Winkelmann. The policy was delivered to Christlaw and by him placed in the hardware company's safe. Later Winkelmann paid the balance due on the premium, $20, and this amount was refunded to him by the hardware company.

At the annual meeting of the stockholders of the hardware company held in January, 1920, Winkelmann, by virtue of his control of the stock, ousted certain directors and elected a majority of the new board. He was re-elected president, and a man by the name of Pust was made manager. In March,

1920, Winkelmann, without consulting any other director of the hardware company, drew that company's check for $77.60 and with it procured a money order for $60.65, payable to the insurance company and drew the balance, $16.95, in cash, which he retained. The $16.95 represented the earnings of the policy, and the $60.65 represented the net amount due on the premium. This latter amount was forwarded to the insurance company and continued the policy in force until February 12, 1921.

In May, 1920, the stock owned and controlled by Winkelmann was sold to persons who immediately took charge of the company and reorganized the board. Winkelmann resigned as president and director and severed his connection with the hardware company, which issued to him a receipt "in full of all accounts to date." In this settlement nothing whatever was said about the policy, but in withdrawing Winkelmann took the policy with him, and in August following secured a change of beneficiary by having the name of his wife, Lydia C. Winkelmann, substituted in lieu of the name of the hardware company. On February 1, 1921, Winkelmann died. Due notice was given, the required proofs of death furnished, and a demand for payment made by Mrs. Winkelmann. On account of a claim preferred by the hardware company, the insurance company declined to make payment and this action was instituted. In response to the summons the insurance company appeared, paid the money into court, and asked to have the hardware company substituted for it as defendant. The request was granted, the insurance company was discharged from further liability, and the cause proceeded as between Mrs. Winkelmann as plaintiff and the hardware company as defendant.

The issues to be tried were framed by the hardware company's cross-complaint and the plaintiff's reply thereto. In the cross-complaint, after the formal allegations, it was alleged that in February, 1919, Winkelmann made to the directors of the hardware company an offer to the effect that if the com-

pany would pay the premium then due and premiums thereafter to become due, he would secure that company to be named beneficiary in the policy and would not thereafter change the beneficiary during the period for which the company paid the premiums; that the company accepted the offer and paid the premium then due and the premium due February 12, 1920; that the change of beneficiary was made pursuant to the agreement and the policy delivered to the hardware company; that Winkelmann wrongfully took the policy when he severed his connection with the hardware company and thereafter wrongfully caused the name of his wife to be substituted for the company as beneficiary.

Upon the trial the hardware company assumed the burden of proof. At the conclusion of its testimony the court discharged the jury, found the issues for the plaintiff, and caused judgment to be entered accordingly. From that judgment this appeal is prosecuted.

In their brief, counsel for the hardware company devote their entire argument to sustain the proposition that the insured, in a policy of the character of the one here involved, may by contract put it beyond his power lawfully to change the beneficiary, or in other words, that by contract the named beneficiary may acquire a vested interest in the proceeds of the policy which cannot be defeated by the act of the insured in causing the beneficiary to be changed in violation of the agreement. The argument, however, proceeds upon the assumption that the contract as set forth in the cross-complaint was proved, and therein counsel beg the real question before this court.

The trial court held that the contract pleaded was not proved and the judgment followed that conclusion. In determining the controversy the court indicated that it found the evidence insufficient to prove: (1) That the agreement of February, 1919, was made with the directors of the company acting as a board; (2) that the company paid the premium due February 12, 1920; and (3) that the company was made bene-

ficiary without the right reserved to the insured to change beneficiary.

We deem it unnecessary to consider either the first or second reason assigned. If we· confined our investigation to the evidence furnished by the policy itself, no difficulty whatever would be encountered, for when the insurance company granted the request for a substitution of the hardware company in the place of the bank as beneficiary, it did so with the express declaration that the insured reserved the right to make further change at will, and with the stipulations in or indorsed on the policy it was delivered to and accepted by the hardware company and retained for more than a year. The contention of the hardware company resolves itself into this: Notwithstanding Winkelmann specifically reserved the right to change the beneficiary at will, he agreed orally for a valuable consideration that he would not exercise that right so long as the hardware company paid the premiums.

The determination of the controversy depends upon the character of the oral contract entered into in February, 1919. The terms of that contract, as detailed by the hardware company's witnesses, are so meager and indefinite that it would be quite impossible from them alone to determine the effect of the agreement. From those terms it is doubtful whether the hardware company bound itself to do anything; certainly it did not bind itself to pay any definite number of premiums. It might have ceased paying at any time without incurring liability. But a key to the interpretation of the agreement is furnished by the evidence of the circumstances under which the contract was made and the purpose or intention of the parties to it. That the contract grew out of the one between Winkelmann and the bank is beyond controversy, and that it had its origin in a conversation between Winkelmann and Miller at the time Winkelmann severed his connection with the bank and entered the employ of the hardware company is equally well settled. While the witnesses Christlaw, Miller and Anderson detailed the terms of the contract, only Miller and Anderson assumed

to tell the purpose of the agreement or the circumstances under which it was made.   Miller, the vice-president and director of the hardware company, testified to the conversation between himself and Winkelmann concerning the policy at the time Winkelmann left the bank, as follows: ''Mr. Winkelmann came to me and talked it over with me and wanted to know if it wouldn't be a good idea to carry it over in the hardware store for the hardware company, and I told him I thought it would be a very good idea.''   When asked to detail the conversation of February 14, 1919, he said: ''Well, that was something on the same lines.   We talked over this policy proposition, and we all agreed that it would be a good idea for the hardware company to carry this policy, and we decided to carry it. * * * Well, it was talked about, that it would be a protection for the hardware company, * * * that he would not change the beneficiary, it would remain as protection to the Savage Hardware Company.''   He testified further that the bank had carried the policy ''as a business policy; business protection,'' and again: ''Q. And the conversation was about the hardware company carrying it as a business policy? A. Yes, sir.   Q. The same as the bank had carried it?   A. Yes, sir. * * * Q. Well, what was said by anybody?   A. Well, I don't remember.   They all talked about it as a good thing to carry it on his life as a protection to the company.   Q. For anything that he might be liable to the company for?   A. Yes, for anything he might be liable to the company for or for anything—if something should happen to him before another man got in there and got acquainted, there would be some loss of business perhaps, and things like that, it was suggested by several of them that was around there.   Q. In other words, it was to be carried for the hardware company the same as it had been carried for the bank?   A. Absolutely.''   Anderson, who had been assistant cashier of the bank while Winkelmann was connected with that institution, and who was a director of the hardware company in 1919, testified that the bank carried the policy ''for business protection.''   He was then asked,

"And for what purpose was the hardware company carrying it?" To which he replied, "Well, for the same protection, I presume."

It is an elementary rule in the construction of contracts that [1] the court must, if possible, ascertain and give effect to the mutual intention of the parties at the time they entered into the contract, so far as that may be done without contravening legal principles. (Sec. 10520, Rev. Codes 1921; *Winslow* v. *Dundom*, 46 Mont. 71, 125 Pac. 136.) "Greater regard is to be had to the clear intent of the parties than to any particular words which they may have used in the expression of their intent. No matter how broad or how general the terms of the contract may be, it will extend only to those matters with reference to which the parties intended to contract." (13 C. J. 523.)

Applying these rules to the evidence before us and the mean-[2] ing of the contract in question is made reasonably clear. Winkelmann agreed that for the indemnity of the hardware company against loss or liability arising from his acts or conduct while in the employ of that company, or loss or liability incurred by reason of his death or removal while connected with the company, he would secure the company to be named beneficiary in the policy and would not change beneficiary so long as that agreement remained in force. The hardware company agreed to pay the annual premiums during the same period in consideration of the protection it would receive. The transaction amounted to nothing more nor less than an equitable assignment of the proceeds of the policy as security for the faithful performance by Winkelmann of the duties which he owed to the hardware company, his employer. When he withdrew from the company and severed his relationship with it, the contract had been performed fully by both parties to it. The company had paid two premiums and had secured the protection intended. No loss or liability had been incurred by it by reason of anything Winkelmann had done or failed to do. Winkelmann had enjoyed the privilege of having his

policy kept in force without expense to himself and had per-
formed faithfully the duties of his position; at least, he had
so conducted himself that the company gave him a complete
acquittance. The contract had performed the function for
which it was created and was at an end. The liability under
the contract was satisfied by the performance of the contract
insured against. (Frost on the Law of Guaranty Insurance,
sec. 217.) The company owed no duty to pay any further
premium and Winkelmann owed no duty to refrain further
from exercising the right reserved to him to change the benefi-
ciary at will. The cross-complaint proceeds upon the theory
that for all purposes of this case the designation of the hard-
ware company as beneficiary was irrevocable. The trial court
held that the evidence failed to sustain that theory, and with
the conclusion we agreed.

The judgment is affirmed.

*Affirmed.*

MR. CHIEF JUSTICE CALLAWAY and ASSOCIATE JUSTICES
COOPER, GALEN and STARK concur.

